Robert WEBB, James R. Douglas and
Southwest Workers Federation,
Plaintiffs,

v.

MISSOURI PACIFIC RAILROAD
COMPANY, Defendant.

No. LR–C–75–189.

United States District Court,
E.D. Arkansas, W.D.

July 16, 1993.

John W. Walker, John W. Walker, P.A., Horace A. Walker, Little Rock, AR, Lazar M. Palnick, Pittsburg, PA, for plaintiffs.

Walter A. Paulson II, and Michael S. Moore, Friday, Eldredge & Clark, Little Rock, AR, Douglas C. Herbert, Washington, DC, for defendant.

## MEMORANDUM OPINION AND ORDER

GEORGE HOWARD, Jr., District Judge.

### Background

This action was instituted on June 25, 1975, by plaintiffs, Robert Webb, James R. Douglas and Southwest Workers Federation, on their own behalf and "others similarly situated". Plaintiffs alleged, in their complaint, that they represented "the class of black persons who are employed, have been employed, have sought employment and will, in the future, seek employment with defendant Missouri Pacific Railroad Company (Missouri Pacific) at its facilities in North Little Rock, Arkansas, who have been and continue to be, and may in the future be adversely affected by the practices complained of." [1]

The "practices complained of" may be briefly identified by quoting directly from plaintiffs' complaint:

1. Missouri Pacific has discriminated against black persons on the basis of race with respect to hiring, job assignment, pay, promotion, discharge, demotion, lay-offs and other terms and conditions of employment.

2. Missouri Pacific maintains a system of segregated and racially identifiable departments and job classifications.

This Court's jurisdiction was invoked pursuant to Title 28 U.S.C. § 1343(3), Title 42 U.S.C. § 1981 and Title 42 U.S.C. §§ 2000e–5, 2000e–8.

On August 13, 1982, this Court, upon plaintiffs' supplemental motion for class certification [2] and following the reception of evidence

---

1. In addition to Missouri Pacific, plaintiff listed the following unions as defendants: International Association Machinists and Aerospace Workers, District No. 15; Brotherhood Railroad Carmen of America; Brotherhood Railway Carmen, Harmony Lodge # 114.

Plaintiffs alleged that the unions, serving as collective bargaining representatives for employees in the Machinist Craft, discriminated against black employees. Plaintiffs added seven additional unions as defendants in their first amended complaint.

The Court notes that, among other things, the inclusion of the various unions as defendants, the intervention of several blacks as party-plaintiffs and the extensive discovery conducted broadened the scope of this proceeding. Indeed, both the North Little Rock Division and the Arkansas Division of Missouri Pacific are involved.

2. Plaintiffs filed their initial motion for class certification on January 28, 1980. Class certification was denied by the then presiding judge, Honorable Richard S. Arnold, on February 11, 1980, without prejudice to move for reconsideration. In the same order denying plaintiffs' motion for class certification, the case of *Abraham v. Missouri Railroad Co.*, LR–C–78–332, was consolidated with this action.

On April 1, 1980, plaintiffs filed their supplemental motion for class certification.

In addition to Judge Arnold, this proceeding appeared on the dockets of the following judges before reaching the docket of the current judge:

for three days, conditionally certified this lawsuit as a class action as to Missouri Pacific and International Association of Machinists and International Aerospace Workers District No. 15, but denied class certification as to the remaining defendant unions.[3]

The Court was also persuaded that the class should be divided into the following subclasses because plaintiffs were challenging Missouri Pacific's employment practices and policies on a division-wide basis, but limited, as suggested by plaintiffs, to Missouri Pacific's operations in North Little Rock, Arkansas, and allied operations in the maintenance-of-way department and the Arkansas Division: (a) applicants, (b) mechanical, (c) maintenance-of-way, and (d) transportation subclasses.[4] In other words, a subclass was created for each department and the rejected applicants for employment. The Court advised counsel, however, that in the event it was determined at a later date that any subclass was not so numerous so as to make joinder impracticable, the Court would entertain a request to decertify that subclass or subclasses.

The Court ordered the issues in this proceeding to be bifurcated with the trial of the liability phase commencing upon the completion of discovery.

Trial of the liability phase commenced on March 24, 1986. However, on June 6, 1986, the Court was advised that the parties had reached a settlement relative to the mechanical and machinists subclasses. On September 18, 1986, the Court entered its order giving final approval to the settlement of these two subclasses, after conducting a hearing for the purpose of considering any objections that might be registered by class members and to determine whether the proposed settlement was fair, reasonable, adequate and in the best interest of the two subclasses.

On December 7, 1992, the Court entered its order dismissing the following Title 42 U.S.C. § 1981 claims pursuant to the ruling of the Supreme Court in *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989) and the ruling of the Court of Appeals for the Eighth Circuit in *Fray v. Omaha World Herald Co.*, 960 F.2d 1370 (8th Cir.1992):[5]

1. Plaintiffs' alleged discriminatory promotion claims that are encompassed within a given bargaining unit, including promotion to assistant track foreman, track foreman and machine operator premised on 42 U.S.C. § 1981.

2. Plaintiffs' alleged discriminatory termination and discipline claims based on § 1981.

3. Plaintiffs' claims asserting discriminatory working conditions because of race which occurred subsequent to the establishment of an employee and employer relationship and grounded on § 1981.

### Burden of Proof

■ The thrust of plaintiffs' contention is that Missouri Pacific has engaged in disparate treatment in employment practices involving blacks as a class. Plaintiffs have the burden of demonstrating that Missouri Pacific intentionally employed and maintained a "policy, pattern or practice" of racial discrimination against the class in employment decisions by a preponderance of the evidence. See: *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 360, 97 S.Ct. 1843, 1868, 52 L.Ed.2d 396 (1977); *Craik v. Minnesota State University Bd.*,

---

Judge G. Thomas Eisele, Judge Terry Shell and Judge Elsijane T. Roy.

3. This Court's memorandum opinion and order certifying this proceeding as a class action conditionally may be found at 95 F.R.D. 357 (1982).

4. Plaintiffs requested the following relief: (1) declaratory judgment, (2) back pay and increased pensions, (3) reinstatement of blacks terminated discriminatorily and (4) an injunction enjoining Missouri Pacific from discriminating against the members of the class.

5. In *Patterson*, the Supreme Court held, in essence, that employment racial discrimination claims that do not "rise[] to the level of an opportunity for a new and distinct relationship between the employee and employer ..." are not covered by 42 U.S.C. § 1981.

The *Fray* decision held that the Civil Rights Act of 1991 which, in effect, overruled the holding in *Patterson* should not be retroactively applied to "pending cases or other pre-enactment" employment decisions.

731 F.2d 465 (8th Cir.1984). In endeavoring to shoulder this responsibility, or stated differently, to establish a *prima facie* case, plaintiffs have proffered both statistical evidence and testimony from class members relating instances as well as circumstances allegedly depicting Missouri Pacific's pattern or practice of purposeful discrimination.

In an effort to enlighten the Court of "the true nature and extent of the racial treatment accorded black employees" by Missouri Pacific, plaintiffs, in the introductory part of their post-trial brief, advised the Court:

> [W]e will attempt to take the court on a walk through the employment experience beginning with the application process through job assignment, terms and conditions of employment, promotion potential, disciplinary actions to termination of employment.

In resolving the remaining issues in this action, the Court will adopt the format employed by plaintiffs in presenting their arguments in their brief.

### Preliminary Issues

#### A.

█ The Court must resolve an issue raised by Missouri Pacific regarding the admissibility of the statistical analysis prepared by Dr. Frank A. James, plaintiffs' expert, based upon a data base supplied by Missouri Pacific, pursuant to plaintiffs' discovery requests, before proceeding with the merits of this proceeding.

First, in the introductory and preliminary sections to plaintiffs' Exhibit 201, plaintiffs' statistical evidence, Dr. James made the following observations:

1. "The data base utilized was generated essentially from Mopac [Missouri Pacific's] payroll data together with some historical records ... while these files focused on the subject work force using a pulse intervals system (snapshots of six months intervals), we can draw some interesting conclusions...."

2. "The first formal situation was to meet with opposing counsel for the Defendant Railroad and their computer expert, Mr. Flolid. The meeting had as its pur-

pose an explanation of the data base provided....

The initial task was to rearrange and organize the data into usable form. This ultimately required the services provided by International Data Processing, Harland Goodner, President. Early searches provided erroneous data, but later a scheme utilizing budget codes and ICC codes was successful. Craft codes and other attempted sorting techniques were abandoned due to inconsistencies in their results."

3. "Missouri Pacific ... sends its tracks and trains over vast area[s] of the United States. Selecting a relevant civilian work force from which to draw employees is not practically possible.

The Arkansas Division and the North Little Rock Terminal will from time to time ... exceed the bounds of Arkansas or Pulaski County and its surrounding counties. As a result any attempt at comparative population studies becomes meaningless.

It is then the position of this study to define the relevant labor pool in some other way. We determine that pool to be the proportion (mean) of those having worked for Missouri Pacific over the twelve years studied."

4. "These [subfiles] were generated from the source tapes by delimiting data base to a relevant labor pool consisting of those employees paid from budgets whose budget codes place the employees in either the North Little Rock Terminal and/or the Arkansas Division." See: Plaintiffs' Exhibit 201.

During the course of plaintiffs' presentation of their case in chief, Missouri Pacific moved to exclude all of Dr. James' studies and statistical analyses based on Missouri Pacific's litigation data base contending that the information is flawed and unreliable. Hence, according to Missouri Pacific, Dr. James' statistical work product is void of any probative value.

Missouri Pacific contends that the information is unreliable for, among other things, the following reasons: (1) lack of use, on the part of Missouri Pacific's managers and employ-

ees in the field, of the system that generated the work history information; (2) lack of an enforcement mechanism to ensure that the necessary information was placed in the system; (3) lack of system audits to check for errors and omissions; and (4) lack of appropriate instructions to users of the system in order to generate a top quality product.

The Court denied Missouri Pacific's motion and observed that the question raised by Missouri Pacific appeared to be one of weight. Missouri Pacific was advised, however, that it would have the responsibility to demonstrate the unreliability of the information relied on by Dr. James in making his analysis and the nonexistence of the probative value of Dr. James' statistical findings.

The Court, consistent with its ruling on the same issue on January 20, 1987, again overrules Missouri Pacific's objection and finds that the problem identified by Missouri Pacific relative to the Work History file, in particular, and Missouri Pacific's litigation data base in general, is a question of weight as opposed to admissibility regarding plaintiffs' statistical evidence. In reaching this conclusion, the Court has taken into consideration the following matters: (a) at page 41 of Missouri Pacific's post-trial brief, the following appears: "Indeed, the company had recognized, well before Mr. Flolid's involvement, that some of the data in the system has never been updated and therefore is not accurate ..." (b) Missouri Pacific knew that plaintiffs' counsel and expert would rely either in whole or in part on the data base in making their statistical analysis; (c) Missouri Pacific's affirmation that weight as opposed to admissibility is the thrust of its objection by asserting: "only minimal weight can be placed on any study based on the Work History file"; and (d) during voir dire by counsel for Missouri Pacific regarding the flaws in its data base, Dr. James readily recognized the importance of the accuracy and completeness of the data relied on in making his analysis; and in reaching his conclusions, Dr. James took into consideration the alleged flaws by using the informa-

tion as "samples" of Missouri Pacific's work force; [6] (e) the evidence reflects that Dr. James also made use of Missouri Pacific's Payroll Data Base in formulating his statistical tables and the parties stipulated that the Payroll file was reasonably reliable and accurate (See: Missouri Pacific's post-trial brief at page 28); and (f) significantly and, perhaps dispositive of the question, Missouri Pacific relied on and submitted data generated from the system to the Equal Employment Opportunity Commission, a federal agency, that Missouri Pacific now challenges as flawed, untrustworthy and practically worthless. It must be remembered that under federal law all employers who employ fifteen or more employees are covered by Title VII and possess a duty to maintain records regarding employment decisions to the end that it may be determined, if the question arises, whether unlawful employment practices have been or are being committed. This, of course, is part and parcel of the employer's duty to file statistical information, EEO–1 Reports, with EEOC. See: 42 U.S.C. §§ 2000e, 2000e–8(c).

In *Phillips v. Joint Legislative Committee on Performance and Expenditure Review,* 637 F.2d 1014, 1025 (5th Cir.1981), the court made the following relevant and persuasive pronouncement that the Court has applied in this proceeding in ruling on Missouri Pacific's challenge of plaintiffs' statistical evidence:

> [A] district court, in assessing statistical presentations in Title VII class actions, should 'accept what figures are available; allow for imperfections, skewing factors, and margins of errors; and then take the figures for what they are worth'. Sometimes this is much, sometimes little.

### B.

Capacity of Assistant Foremen, Foremen, Conductors And Engineers To Render Missouri Pacific Liable For Al-

---

6. Plaintiffs have asserted throughout this proceeding that periods prior to the relevant time frame have probative value from a historical perspective in demonstrating purposeful discrim-

ination. See: *Hazelwood School Dist. v. United States,* 433 U.S. 299, 309–310, 97 S.Ct. 2736, 2742–2743, 53 L.Ed.2d 768 (1977).

leged Racial Slurs And Creating A Hostile Work Environment

During the course of the trial, plaintiffs offered testimony from class members describing the adverse working conditions that black employees were subjected to on the part of white assistant foremen, foremen, conductors and engineers by repeating the alleged racial remarks and slurs made by these individuals in the course of their assigned responsibilities.[7] Missouri Pacific objected to the admissibility of the testimony. Missouri Pacific argued that it could not be held accountable for the unauthorized actions of these "non-management employees" who were members of the same unions as their co-employees even though these individuals had been authorized and designated by Missouri Pacific to assume certain responsibilities for directing work activities of their fellow employees. The Court reserved a ruling on Missouri Pacific's objection and permitted the parties to address the question in their post-trial briefs.

Missouri Pacific cites *Waverly–Cedar Falls Health Care Center v. NLRB,* 933 F.2d 626 (8th Cir.1991); and *NLRB v. Harmon Industries, Inc.,* 565 F.2d 1047 (8th Cir.1977) in support of its position that its foremen, engineers and conductors are not supervisors because these co-employees are not empowered to hire, fire or discipline employees under their management.[8]

Title 42 U.S.C. § 2000e(b) provides in relevant part:

The term "employer" means a person engaged in an industry affecting commerce ... and any agent of such a person ...

In *Baker v. Stuart Broadcasting Co.,* 560 F.2d 389, 391 (8th Cir.1977), the court emphasized that Title VII of the Civil Rights Act of 1964 is to be given a liberal construction in order to implement the purposes of Congress to eliminate the inconvenience, unfairness and humiliation of racial discrimina-

tion. See also: *Parham v. Southwestern Bell Tel. Co.,* 433 F.2d 421, 425 (8th Cir. 1970).

In 2A C.J.S., Agency § 4.c the term agent is defined as:

An agent is one who, by the authority of another, undertakes to ... manage some affairs on account of such other, and render an account of it. He is a substitute, ... appointed by his principal primarily to bring about business relations between the latter and third persons.

Section 52 of 2A C.J.S. provides:

The relation of agency need not depend upon express appointment and acceptance thereof, but may be, and frequently is, implied from the words and conduct of the parties and the circumstances of the particular case. The law creates the relationship of principal and agent if the parties, in the conduct of their affairs, actually place themselves in such position as requires the relationship to be inferred by the courts, and if, from the facts and circumstances of the particular case, it appears that there was at least an implied intention to create it, the relation may be held to exist, notwithstanding a denial by the alleged principal, and whether or not the parties understood it to be an agency.

It is clear from the evidence and, as a matter of fact Missouri Pacific concedes as much, that Missouri Pacific has delegated responsibility and authority to certain employees, assistant foremen, foremen, engineers and conductors, to supervise and monitor the work activities of co-employees and they are further required to report directly to designated management personnel any problems encountered in implementing these directives. Moreover, these representatives may be called upon to recommend or suggest certain sanctions for any rule violation witnessed. It is clear that these designated

---

7. In the Maintenance–of–Way Department these employees are designated as assistant foremen and foremen. In the Transportation Department these employees are engineers and conductors.

8. Earnest Franklin, a black, who served as a foreman in the Maintenance–Of–Way, testified

that he could terminate black employees under his supervision immediately for an infraction, but as to white employees under his supervision, Franklin was required to present a written complaint to his roadmaster before he could discharge a white employee for an infraction.

employees, endowed with unqualified approval of management, are representing the interests of Missouri Pacific and are rewarded for such faithful performance in salary benefits; and Missouri Pacific cannot avoid its obligations and responsibilities under the Civil Rights Act of 1964 on the theory that these representatives are co-employees of plaintiffs. It is plain that Missouri Pacific is endeavoring to place form over substance.

In rejecting Missouri Pacific's assertion that the holdings in *Waverly–Cedar Falls Health Care Center v. NLRB,* and *NLRB v. Harmon Industries, Inc.* are dispositive of the question here, the Court notes that the Court of Appeals in these cases simply found that there was substantial evidence supporting the National Labor Relations Board's finding that certain employees were not supervisors within the meaning of Section 2(11) of the National Labor Relations Act, 29 U.S.C. § 152(11).

Section 2(11) of the Act provides the following statutory definition of a supervisor:

> The term 'supervisor' means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

In each action, the question was a close one and the Court of Appeals deferred to the findings of the Board regarding the factual question at issue.

In the instant case, this Court is persuaded that the employees in question, assistant foremen, foremen, conductors and engineers were serving in a dual capacity, namely, employees and agents of Missouri Pacific. See: 2A C.J.S., Agency § 16.

Accordingly, this Court finds that Missouri Pacific's objection is not well taken and is overruled.

## C.

### Signal and Communication Employees

The Court reserved a ruling on the question whether signal and communication employees are encompassed in the Maintenance–Of–Way Subclass in order to afford plaintiffs an opportunity to offer evidence on this issue.

After reviewing the record, the Court finds that the evidence reflects that signal and communication employees are in the separate Signal Department and are not associated with the maintenance of tracks. Accordingly, the Court sustains Missouri Pacific's contention that the Maintenance–Of–Way Subclass should not be extended to include signal and communication employees.

### I

### Applicant Subclass

▮ The Court finds that plaintiffs have failed to establish a *prima facie* case by a preponderance of the evidence that Missouri Pacific engaged in a pattern or practice—the standard operating procedure—predicated on race in which black applicants, seeking employment with Missouri Pacific, were treated less favorable than white applicants. However, assuming that plaintiffs have established a *prima facie* case, the Court is persuaded that Missouri Pacific has demonstrated that its hiring practices are not unfavorable to black applicants because of race.

Although the methodology employed by each expert differs, Dr. Frank James, plaintiffs' expert witness, as well as Dr. Robert Russell, Missouri Pacific's expert witness, concluded, after reviewing and analyzing alleged relevant data, that blacks, between 1972–1983, were overrepresented in Missouri Pacific's new hires statistically speaking.

Dr. James testified that the percentage of relevant blacks in the population pool was 16.3%, but the percentage of blacks as new hires at Missouri Pacific was approximately 26.3%. Dr. James' conclusion was based upon a comparison of the black hiring percentages of Missouri Pacific to the black representatives in the external work force as well as the internal work force of Missouri

Pacific.[9] Dr. James did not, seemingly, seek to determine the statistical significance of the disparity, if any, between blacks actually hired and the expected number or percentage. However, Dr. James testified that if he had made such a computation, he would expect the new hire to "mirror these in the work force of 16.3[%]" and it is likely that the conclusion would "show that blacks are hired in larger numbers." In other words, "blacks are overrepresented in the new hire group."[10]

Dr. Russell's opinion was based upon an analysis of the black percentage of those individuals hired into eight job categories of Missouri Pacific's compared to the percentage of blacks in the Little Rock Standard Metropolitan Statistical Area (SMSA) of individuals minimally qualified for the jobs in the eight job categories selected.[11] In other words, Dr. Russell matched each job category with the census categories that contained potential employees possessing the relevant minimum qualifications. Employing these census categories, Dr. Russell determined the projected black availability for each job in the Little Rock area.

Dr. Russell opined that there is no statistical basis for an inference of a pattern or practice of discrimination against blacks in hiring at Missouri Pacific's North Little Rock facility. The following are summary Z statistics of the eight job categories that Dr. Russell analyzed and served as a basis for his opinion that in none of the eight job categories is there any statistical evidence warranting an inference of discrimination since the results in each job category do not fall below -2.0:

| Journeyman | +0.82 |
| Mechanical Helper or Apprentice | -1.82 |
| Mechanical Shop Laborer | +3.75 |
| Maintenance-of-way | +2.32 |
| Signals and Communications | -1.19 |
| Transportation | -1.06 |
| Stores and Materials | -0.75 |
| Clerical | +2.56 |

After carefully considering both Dr. James' and Dr. Russell's analyses, this Court is of the view that neither Dr. James' analysis nor Dr. Russell's analysis demonstrates "long lasting and gross disparity" between those blacks actually hired by Missouri Pacific during the relevant time frame and those pools resorted to in making the statistical comparisons. See: *Hazelwood School Dist. v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977); *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975).

During the class certification hearing in 1981, Missouri Pacific's counsel, at the conclusion of the hearing, tendered a document containing proposed findings of facts and conclusions pertaining to the issue of numerosity relating to the number of black and white applicants and hires for the years 1977 through 1980. The proposed findings, among other things, specified that the flow logs disclosed that 3,634 persons applied for work during that four year period; that 1,141 of those applicants were black and 246 were

9. It is unclear whether Dr. James made an effort to determine the qualifications of those blacks contained in the "external work force" in making his comparison. Nevertheless, the Court finds that Dr. James' analysis has probative value given the fact that both experts agree that Missouri Pacific has a good hiring record relative to blacks even though each expert's approach in analyzing the question differs.

10. Missouri Pacific offered summer jobs to full-time students over eighteen years of age in its facilities and these employees were characterized as summer hire. Plaintiffs proffered evidence demonstrating that black students sought employment as summer hire, but plaintiffs' counsel advised the Court that no relief was being sought and the evidence was offered for background purposes only.

Dr. James testified that he included the summer hires in his hiring analysis, but did not analyze the summer hire separately or according to race and could not say whether there was a disparity in the employment of white and black students.

11. The eight job categories selected by Dr. Russell, after conferring with appropriate Missouri Pacific officials regarding the skills and qualifications for these jobs, are as follows: journeyman, signal and communications clerks, mechanical helper or apprentice mechanical laborer, maintenance-of-way, transportation and stores. For the first three job categories, Dr. Russell used census data on the relevant craft clerical workers in the Little Rock SMSA; and for the remaining five categories he used the census figure for unskilled and semi-skilled workers in the Little Rock SMSA. See: DX 5.1 through 5.8.

hired; that 1893 whites applied and 446 were hired. Based on these figures, it appears that blacks constituted 35.5% of those applicants actually hired. Plaintiffs argue that Missouri Pacific, in effect, admitted that the applicable benchmark figure is between 30% and 50% if not in fact 37.6%. Close scrutiny of the proposed findings discloses that the proposed findings were predicated on the following condition contained in a footnote on the first page of the document:

> Because the Court is prevented by Rule 23 from inquiring too deeply into the merits, these Findings are conditional only, and may and probably will change after defendant has been given full opportunity to present rebuttal evidence. See: DX 2418A.

The Court is not persuaded that Missouri Pacific stipulated or admitted that 37.6% constituted the benchmark figure in determining the expected hiring rate of black applicants during the relevant time frame.

Plaintiffs also contend that the testimony of Annette Johnson, a black female clerk for Missouri Pacific who accepted applications for employment at the Pike Avenue Mechanical Shop from 1973 until the early part of 1977, has provided an additional evidentiary basis for a finding that 37.6% is Missouri Pacific's expected hiring rate of black applicants. It is plain that Ms. Johnson did not have personal knowledge of the number of blacks and whites who applied for employment during the period she served as clerk. She emphasized that she could only offer estimates and could not "state under oath" what percentage of the applicants constituted either black or white.

Plaintiffs also argue strenuously that the appropriate medium for comparison, in order to determine whether the hiring rate of black employees in the applicant subclass was statistically significant, is the "applicant flow data" which would, in the instant case, demonstrate that the black availability for employment would range between .30% and 50%. In rejecting plaintiffs' argument, the Court simply notes that Dr. James testified that he did not rely on Missouri Pacific's applicant flow data in his analysis because of "inconsistencies and exclusions" contained in the data.[12] Dr. Russell's analysis is not predicated on the applicant flow data for the same reasons.

Plaintiffs argue that it was Missouri Pacific's obligation to maintain and produce reliable and trustworthy data since Missouri Pacific was aware of the charges of discrimination at both the administrative stage as well as the current proceedings; and that Missouri Pacific may not take advantage of or benefit from its own neglect in compiling and maintaining accurate records. As noted previously, Title VII, indeed, imposes a duty on an employer who employs fifteen or more persons to maintain records relating to employment decisions involving its workforce and to file periodic reports with EEOC regarding its employment actions. Nevertheless, the Court is persuaded that the evidence currently before the Court warrants the conclusion reached relative to the applicant subclass.

After carefully considering all of the evidence proffered with reference to the applicant subclass, the Court is not persuaded that plaintiffs have established a *prima facie* case and the complaint of the applicant subclass is dismissed with prejudice.

## II.

### Job Assignments And Promotions To Management And Non–Management Positions In Maintenance–Of–Way

■ Plaintiffs contend that once black applicants are accepted as hires, Missouri Pacific, pursuant to a standard operating procedure, assign blacks to "lower level", "dirtier jobs", "the most physically demanding job"

---

12. Mr. Mark Flolid, who was retained by Missouri Pacific to construct a data base to be used in this action, testified that the applicant flow was defective because of, among other things, coding errors—the omission of all hiring in the Stores and Transportation Departments for the years 1980–82 for the relevant areas involved in this action and the inclusion of hiring jobs outside the area encompassed in the class definition. In other words, the applicant flow included applicants for employment in the states of Louisiana, Kansas, Missouri and Tennessee. Only the North Little Rock facility and the Arkansas Division are relevant in this proceeding.

and expose such workers to "all kinds of unpleasant environmental and weather conditions", while white hires are placed in "the cleaner upper level and management jobs."

Plaintiffs proffered Dr. James' statistical analysis of the racial composition of each job in the Maintenance–of–Way and Transportation Departments, the two remaining sub-classes, to support their contention that the Maintenance–of–Way Department is essentially a "black department" and the Transportation Department is in essence a "white department".

Dr. James' analysis is based on a litigation data base prepared for Missouri Pacific by Mr. Mark Flolid to be used in this litigation. Missouri Pacific's litigation data base, in essence, consists of Missouri Pacific's "Work History" segment of Missouri Pacific Human Resource System and information derived from Missouri Pacific's "Payroll Computer Data Base" which contains the information used by Missouri Pacific to pay its employees. Dr. James made use of the Work History data base to construct his analysis of promotions and terminations.

Missouri Pacific also argues plaintiffs could have made use of the primary records, personal record files and seniority rosters, in preparing their statistical analysis and, thus, avoid the problems encountered in relying on a deficient data base. Missouri Pacific has not demonstrated that these primary records are so reliable that these records would have a greater probative value. Significantly, and perhaps dispositive of the issue, Missouri Pacific relied on and submitted data generated from the system to a federal agency, Equal Employment Opportunity Commission, that Missouri Pacific now challenges as flawed, untrustworthy and practically worthless. Indeed, Missouri Pacific knew or should have known that the central purpose in structuring and maintaining the records in question is to assist in the resolution of controversies involving employment decisions such as we have in the current case.

Moreover, it is clear that the thrust of plaintiffs' action is disparate treatment and plaintiffs are relying on both statistical and nonstatistical evidence to meet their burden. In addition, as previously noted, Dr. James also made use of Missouri Pacific's Payroll Data Base in formulating his statistical tables and the parties stipulated that the Payroll file was reasonably reliable and accurate. See: Missouri Pacific's post-trial brief at page 28. The comparisons proffered by Dr. James disclose large disparities as opposed to close or marginal differences. Accordingly, the Court is not persuaded that Missouri Pacific's request to strike Dr. James' analysis should be granted.

Dr. James testified that black employees in the Maintenance–of–Way Department constituted 31.1% of the workforce during the relevant time frame and that these black employees held or occupied the dirtier and lower level jobs. See: PX 201 and Table 2.1 of the same exhibit. However, the percentage of black employees within the trackman positions at the North Little Rock Terminal and the Arkansas Division is approximately 47.-5%. See PX 201, Table 2.9. Trackmen are responsible for the construction and building of railroad beds and rail tracks. This work assignment is essentially physical labor. The z-value, according to Dr. James, is 13.157 and, accordingly, statistically significant. In other words, blacks are overrepresented at this job level and it is unlikely to be the result of chance, thus creating an inference of discrimination.

At the assistant foreman and foreman level, the first level of promotion relative to the trackman's slot, blacks, percentage wise, constitute 29.7% of the first level of supervisors.

Relative to the positions of Assistant Roadmaster and Roadmaster, a supervisory slot above the foreman's position, blacks constitute 10.2% of these employees.[13] See: PX 201, Table 2.2.

Dr. James' analysis disclosed the following black percentages in the following divisions within Maintenance–of–Way Department: (a) Bridges and Building Helper Apprentice 19%, (b) Bridges and Buildings Equipment

---

**13.** Missouri Pacific concedes that there is statistically significant underrepresentation of blacks in the management position of roadmaster when compared to the Maintenance–of–Way Department workforce as a whole, but not the company as a whole. See: Dr. Russell's Table 2.2., DX.

Operators 26.3%, (c) Bridges and Buildings Journeymen 7.6%, (d) Bridges and Buildings Inspector Gange Foremen 0.7%. PX 201, Tables 2.3–2.12.

The following constitutes testimony proffered by plaintiffs from class members detailing specific instances of discrimination on the part of Missouri Pacific in job assignments of black employees:

Eric Hawkins, a former member of the United States Air Force where he acquired experience in the mechanical operation and repair of diesel equipment, applied for employment with Missouri Pacific, following his discharge from service, in 1977. Hawkins was advised that Missouri Pacific had only trackman jobs available, but he would be afforded the opportunity to transfer to other areas of interest. At the time of Hawkins' acceptance of the trackman position, the area where he worked was approximately 95% black. Hawkins further related that whites employed initially in the same area where he was assigned were transferred to other areas in a relatively short period of time while blacks, on the other hand, remained as trackmen.

Walter Robert Washington testified that he applied for any position available in 1974 and was assigned to a trackman group that was totally black, except the foreman, Pop Piles who was white.

William Baucum was hired as a trackman in 1984 and testified that during his tenure as a trackman that of the one hundred trackmen constituting the workforce, ninety-six were black and four were white while all of the supervisors and machine operators were white. In other words, Washington stated that blacks were assigned the unskilled slots involving the physical labor while whites were given the skilled jobs, i.e., welding, welding helpers, foremen, machine operators and roadmaster.

Kenneth Welch who was hired in 1972 as an assistant to the district engineer and subsequently elevated to the position of district engineer over the Maintenance–of–Way Department that includes Track, Bridge and Building and Road Equipment Repair testified that he was unaware of a black having been hired in the slots of district engineer, or assistant to the district engineer.

Andre Hawkins testified that when he was hired as a trackman, blacks were assigned the distasteful or menial jobs and whites filled practically all of the management and supervisory slots. Hawkins also testified that the track gang was basically black.

Missouri Pacific, in effect, argues that Dr. James' statistical analysis based on the Payroll–Based Workforce Profiles (PX201, Tables 1.0–6.2) should be afforded minimal weight in determining whether there has been racial patterns in employment decisions since June 25, 1972, because Dr. James did not take into consideration, among other things, the following factors: (a) voluntary employee decisions about which jobs to bid for; (b) difference in qualifications of applicants for employment; (c) differences in job performance of employees; (d) differences in the rate of rule violations by employees; or (e) discretional decisions by Missouri Pacific managerial employees. Further, Missouri Pacific asserts that Dr. Russell, Missouri Pacific's expert, prepared "Progress Reports" for each job that Dr. James had identified as statistically significant black underrepresentation, by utilizing Dr. James' own material, and found that the percentage of black employees had substantially increased since the year 1972. Missouri Pacific concedes that Dr. Russell's "Progress Reports" were not intended to resolve whether there had been discrimination within the relevant time period, but only to preclude any "possible inferences" from Dr. James' workforce profiles.[14]

The Court would note that at the conclusion of plaintiffs' case in chief, the Court granted Missouri Pacific's motion to dismiss plaintiffs' promotion claims in the Transportation Subclass, but reserved a ruling on Missouri Pacific's motion to dismiss the pro-

---

**14.** Relative to promotions from union to non-union jobs (promotions from MOW to Management), Missouri Pacific states at footnote 60 in its post-trial brief that Dr. Russell had prepared an incomplete error-filled promotions analysis and that this work product should not be given any credence.

motion claims relating to the Maintenance–of–Way Subclass.

■ The Court finds that Missouri Pacific resorted to standardless policies and practices when making meaningful employment decisions [15]. After reviewing plaintiffs' statistical evidence, the testimony of approximately four class members relating individual examples of discrimination [16], the history of discriminating practices by Missouri Pacific, and the anecdotal testimony proffered by plaintiffs in connection with their "terms and conditions claims", this Court holds that plaintiffs have established a *prima facie* case, by a preponderance of the evidence, that Missouri Pacific maintains a policy, pattern and practice of discriminating against the members of the maintenance-of-way subclass in job assignments and promotions which action is based on race. Moreover, the practice is Missouri Pacific's standard operating procedure.

■ In addition to challenging the probative value of plaintiffs' statistical evidence, in an effort to offer legitimate and nondiscriminatory reasons for its employment decisions involving blacks in Maintenance–of–Way Department, Missouri Pacific offered evidence articulating, among other things, the following:

1. All job assignments within the maintenance-of-way subclass are governed by the collective bargaining agreement between Missouri Pacific and Brotherhood of Maintenance–of–Way Employees.

2. When vacancies are created, bulletins are prepared, posted and distributed to the employees.

3. In filling vacancies, the senior bidder is assigned.

4. In order to qualify for an assistant track foreman or track foreman one must be familiar with the rules, be able to read and write and communicate with people.

The Court finds that Missouri Pacific has neither rebutted plaintiffs' *prima facie* case, nor discredited plaintiffs' evidence.

The Court would further note the following in support of the conclusion that Missouri Pacific has failed to rebut plaintiffs' *prima facie* case:

1. The existence of a collective bargaining agreement between Missouri Pacific and the Brotherhood of Maintenance–of–Way Employees does not relieve Missouri Pacific of its Title VII obligations not to discriminate on the basis of race in employment decisions.

2. The findings of the Court, hereinafter discussed, relating to the prolonged and continuous racially intimidating and insulting environment that the maintenance-of-way subclass members were subjected to on the part of white co-employees and supervisors as well and the failure of Missouri Pacific to take steps to remedy the ongoing racial harassment, not only expressed contempt for the black subclass members, but disclosed a narrow concern about the welfare of black employees. Indeed, this closed-minded attitude not only strengthened plaintiffs' case, but created a cloud over the alleged legitimate reasons asserted by Missouri Pacific for its actions.

3. As previously noted, in the case of *Ingram v. Missouri P.R. Co.*, 897 F.2d 1450 (8th Cir.1990), the court affirmed the lower court's finding that James Hart, District Personnel Manager, was found to have harbored a racially discriminatory motive involving a promotion decision

---

**15.** The evidence received regarding summer hires, which was offered for background purposes only, reflects that white summer employees (students) outnumbered blacks by a ratio of 11.5 to 1. The evidence also disclosed that nepotism and friendship were key factors relied on in the placement of summer hires.

In addition, in the case of *Ingram v. Missouri P.R. Co.*, 897 F.2d 1450 (8th Cir.1990), the Court of Appeals affirmed the lower court's unpublished opinion that found that James Hart, District Personnel Manager, who possessed a leading managerial role in maintenance-of-way in the

Arkansas Division was found to have harbored a racially discriminatory motive involving a promotion decision where a black employee was involved.

**16.** It is clear that plaintiffs are not required to demonstrate that each member of the class was a victim of discrimination in order to establish a *prima facie* case of intentional discrimination. See: *International Brotherhood of Teamsters v. United States*, 431 U.S. at 324, 360, 97 S.Ct. at 1867.

where a black employee was involved. However, Missouri Pacific in its post-trial pleadings advises the court that "On January 1, 1981 the hiring functions were further consolidated and Hart became the District Employment Representative. Hart was subsequently responsible for the hiring of all non-management personnel in the Eastern District of the railroad [which includes the facilities involved in his action]."

## III

### Terms And Conditions Of Employment [17] In Maintenance–Of–Way And Transportation Departments

■ The question to be resolved here is whether a pattern and practice of racial discrimination existed with respect to terms and conditions of employment relative to black maintenance-of-way employees after June 12, 1975, and with respect to black Transportation employees after January 26, 1979. Only Title VII is implicated here.

In endeavoring to establish a *prima facie* case of racial harassment, slurs and disrespect that black employees were subjected to in the work environment, in connection with the class claims regarding terms and conditions of employment, plaintiffs offered the following testimony from individual class members:

1. Phoebe Hudspeth, a black female brakeman, testified that she rejected the sexual advances of a white male engineer, Earl McKenzie and, as a consequence, McKenzie threatened to have her removed from the job. Hudspeth stated that she advised McKenzie that she was going to register a complaint with their supervisor. McKenzie replied, according to the testimony of Hudspeth, "Oh yeah, and if you do, you will be one dead nigger." Hudspeth stated that she reported the incident, as well as other similar incidents, to the superintendent, L.A. Roach, but no action was taken.

2. Charles Malone testified about racial slurs written on walls on railroad property in Arkadelphia; and related an incident in which he removed a sign which read "nigger where is the world coming to, a nigger trainmaster." The Court, at the suggestion and approval of counsel, toured the North Little Rock facility of Missouri Pacific and during the tour observed a KKK sign on a storage boxcar.

3. Lawrence Barbee testified about racial slurs written in bathrooms at railroad facilities within the Arkansas Division.

4. Darryl Talley testified that when he protested being called "boy", his track foreman, Lester Rorie, replied: "you're a smart ass little nigger, aren't you?" Talley further testified that in reporting the

17. Missouri Pacific has moved to dismiss the terms and conditions claims under Title VII of the Maintenance–of–Way and Transportation subclasses on the ground of mootness. Missouri Pacific argues that during, at least, the past six years, Missouri Pacific has taken extensive steps by way of affirmative action and antidiscrimination programs to remedy the complaints of the class and, as such, no injunctive relief is appropriate and that prior to the 1991 Civil Rights Act, Title VII provided only back pay and no other monetary relief for alleged discrimination in the terms and conditions of employment.

The Court, after carefully considering Missouri Pacific's argument, denies the requested relief. Prior to 1991, relief granted plaintiffs under Title VII was generally equitable in scope (injunctive relief) and a plaintiff seldom prevailed in obtaining compensatory and punitive damages. This Court is of the view that the remedial section of Title VII vests the courts with broad equitable powers to fashion such relief as the circum-

stances involved may require in order to make whole the victims of racial discrimination as well as eliminating the discriminatory effects of the past and eliminating similar conduct in the future. To this end, the Court, during the remedy phase, will afford plaintiffs the opportunity to offer suggestions that may be employed in endeavoring to make the victims whole. Most importantly, the Court is not convinced, based upon the current record, that the work environment complained of is free of the adverse conditions testified to by the plaintiffs and class members. See: *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (the Supreme Court stated, among other things, that it is also the purpose of Title VII to make persons whole for injuries suffered on account of unlawful employment discrimination.); *Ingram v. Missouri P.R. Co.*, 897 F.2d 1450 (8th Cir.1990) (the court stated that the type of relief to be fashioned in an employment discrimination case is committed to sound discretion of the trial court.)

incident to Rorie's supervisor, Hillebrandt, Hillebrandt advised Talley to go to work.

5. Sidney Williams, Henry Johnson and Mike Wilkins related instances when immediate supervisors used "nigger", "nigger division" and "black ass" in referring to black employees in the course of their employment; that these incidents were reported to their supervisors' superiors, but no corrective measures were taken.

6. Barry Duran Stewart who was employed from 1977 through 1979 as a switchman, brakeman and fireman testified that on an occasion, trainmaster Joe Bikarski stated to him "nigger, you better not show up on my job late again."

7. Otis Ransom testified that General Roadmaster Pratt referred to black employees as "niggers" and further commented that the only thing that he did not like about the railroad was "niggers and women."

8. General Manager R.G. Lang testified that he never reprimanded employees that he heard using racial slurs. Lee Roach, a division superintendent testified that he did not write up any report about the use of racial terms that he witnessed. Roach had formerly served as an assistant superintendent.

9. Joe Louis Hunter related that racial slurs were used by his foreman, a Mr. Cook, at the North Little Rock facility; and that Roadmaster Clyde Brown had also used racial slurs.

10. Testimony was elicited to the effect that a white foreman, Johnny Niswonger, would bring watermelon on the job and make racist remarks calling Andre Hawkins "nigger" and "watermelon." Upon reporting the incident to the foreman's superior, Mr. Billingsley, Mr. Billingsley replied that "as long as [Niswonger had not placed] a hand on [Hawkins], there's not really much he could do about it."

11. There was testimony to the effect that foreman Gene Butler grabbed Louis Pressly by the collar and kneed Pressly on the buttocks and stated "that's the way all you darkies ought to be—that's the way I ought to take and do all you darkies."

12. Plaintiffs also proffered testimony demonstrating that blacks were required to work in severe or inclement weather conditions, i.e., rain, sleet and snow, while white employees were assigned tasks indoors; that on the road work assignments, blacks were not allowed to go into town for lunch, but white employees were permitted to do so. Blacks were required to eat sandwiches that the white employees brought back. There was testimony to the effect that white employees, during lunch breaks, were released earlier than blacks, thus enabling whites to get the shaded and more comfortable places to relax.

This Court is persuaded that plaintiffs have demonstrated, by a preponderance of the evidence, that black employees, in both the North Little Rock facility and the Arkansas Division, were required to work in an environment that was racially intimidating and insulting; that the racial harassment and intimidation complained of are not isolated instances, but are prolonged and continuous involving white co-employees and supervisors as well; and that Missouri Pacific has failed to take steps to remedy the ongoing racial harassment. In essence, the Court finds that Missouri Pacific condoned the harassment. Further, the Court finds that Missouri Pacific has failed to rebut plaintiffs' *prima facie* case.

## IV

### Discharge and Discipline

Plaintiffs, Transportation and Maintenance-of-Way subclasses, contend that Missouri Pacific discharged and disciplined black employees at a higher rate than whites on account of race. Missouri Pacific asserts, and the Court agrees, that the only remaining question for resolution relative to discharge and discipline is whether there was a pattern and practice of intentional racial discrimination in the actions taken against Maintenance-of-Way subclass members after June 12, 1975, implicating Title VII only. See: Court order of December 7, 1992, dismissing certain section 1981 claims. The date June 12, 1975, is 180 days just prior to subclass representative Earnest Franklin filing his administrative complaint with the

Equal Employment Opportunity Commission.[18]

In order to establish a *prima facie* case of discriminatory termination or discipline, plaintiffs must demonstrate that other employees similarly situated but not of the same race were treated differently. *Talley v. United States Postal Service*, 720 F.2d 505 (8th Cir.1983); *Underwood v. Jefferson Memorial Hospital*, 639 F.2d 455 (8th Cir.1981).

Plaintiffs' exhibit 201 is, in essence, a compilation of plaintiffs' statistical evidence identified as tables. Tables 8.3 through 8.6 relate purportedly to Missouri Pacific's termination and disciplinary practices for the time frame beginning in 1973 and ending in 1984 inclusive.[19] Table 8.3 represents an analysis of data that includes students employed for the summer months; table 8.4 is an analysis without taking into consideration the student workers; table 8.5 depicts an analysis of the student population returning to school at the end of summer, but the data appeared in the termination print-out as terminations; and table 8.6 is simply characterized as "[t]erminations: [d]ismissed for [d]isciplinary action." Dr. James reached the conclusion, which is based on the tables set forth in plaintiff's Exhibit 201, that black employees dismissed for disciplinary reasons were disproportionately dismissed and that "this practice of overrepresentation is not due to chance."

Missouri Pacific argues rather persuasively that Dr. James statistical analyses, tables 8.3 through 8.6 as well as the conclusion reached, have no evidentiary or probative value because, among other things, Dr. James conceded that he could not determine from his analyses just what portions of the asserted disparities reflected in his tables resulted from voluntary employee termination, rule violations, poor probationary performance or other nondiscriminatory reasons relied on by Missouri Pacific in terminating employees. In addition, it is readily apparent that Dr. James did not take into consideration the distinction between a mere suspension as opposed to a dismissal, nor the practice of Missouri Pacific of reinstating some employees who had been terminated after a relatively short period of time following dismissal. Given these circumstances, the Court is of the view that plaintiffs' statistical evidence relative to dismissals and discipline must be disregarded. Indeed, plaintiffs virtually concede at page 70 of their post-trial brief that plaintiffs rely essentially on the proffered anecdotal evidence in seeking to establish a *prima facie* case on the termination and disciplinary claims.

Plaintiffs have offered the personal experiences of Earnest Franklin, a class member, to demonstrate that more stringent discipline is meted out to blacks in the Maintenance-of-Way Department than to whites for similar infractions.

Earnest Franklin, a track foreman, was accused by his immediate supervisor of sleeping on the job "instead of installing rail anchors on the tracks" under repair as instructed. Franklin denied that he was sleeping, but asserted that he had a headache and was simply seeking relief or comfort. Robert Ellerd, General Roadmaster, confirmed that Franklin was a good worker and complied with all of Ellerd's instructions; and that Franklin had no prior disciplinary record at the time. D.L. Neely, the investigator assigned to investigate the alleged infraction, recommended to William Hillebrandt, Terminal Superintendent, that a 60 day actual suspension be imposed against Franklin for the alleged infraction. Nevertheless, Hillebrandt imposed dismissal. After 170 days had expired from the date of Franklin's dismissal, Franklin was permitted to return to work as a trackman and not in his former capacity as track foreman. The evidence reflects, however, that Franklin was ultimately reinstated to the position of track foreman.

The evidence reflects, however, that the following white employees, T.G. Allen, an inspector of freight cars, T.J. Blaty, an elec-

---

**18.** All of the Transportation subclass discharge claims have been dismissed by the Court.

**19.** Table 8.5 relates to students employed during the summer months and was offered by plaintiffs for background purposes only. However, Dr. James observed that the data analyzed appeared in the termination print-out as terminations.

trician, and J.W. Allen, a clerk, were found sleeping on the job and each was assessed 30 days actual suspension without a reduction in either seniority or job title. Moreover, the evidence also reflects that these three white employees had prior disciplinary records at the time of the sleeping incidents.

In responding to a request to explain the difference in the treatment accorded the three white employees and Franklin, Superintendent Hillebrandt stated: "part of it may have had to do with the fact that Mr. Franklin was the foreman," but Mr. Hillebrandt conceded that there was no rule requiring a greater punishment premised on one's title or position; and further replied:

"Q. Now, this gentleman [T.J. Blaty] was given only 30 days. Can you tell me why he's given—an electrician who is white only given 30 days even six years later when Mr. Franklin gets 170 [days] from you?

A. Not specifically, no, I can't."

Russell Vaughn, a white conductor, was found sleeping on the job and was dismissed for 120 days. At the time, however, Mr. Vaughn had a prior record for failing to report an accident resulting in an injury to a co-employee. Significantly, Mr. Vaughn returned to work in his capacity as conductor. Approximately a year later, Mr. Vaughn was given a 30 day deferred suspension. In another incident, Mr. Vaughn admitted, during the investigation, that he had consumed beer prior to reporting for work.

In November, 1976, Franklin was disciplined a second time by Hillebrandt for occupying the main track without, purportedly, authority resulting in a collision between a freight train and Franklin's motor car. There, seemingly, was no property damage or personal injuries. Franklin was dismissed for 6 months.[20]

J.B. Metcalf, a white employee, was dismissed for two months in February, 1974, for a violation resulting in a 32 car derailment. Metcalf was permitted to return to work on a leniency basis without pay for all the time lost along with unimpaired seniority rights. At the time of Metcalf's dismissal, Metcalf had been disciplined for causing accidents, sleeping on the job, failure to show up for work when called and failure to inspect his train.

The following white employees received the designated sanctions for sleeping on the job: T.L. Colclasure 90 days actual suspension, D.M. Price 30 days actual suspension, Skinner was assessed 30 days dismissal, but returned to work after three weeks. Ore Wakefield received 90 days actual suspension and Wayne McNeely was assessed 90 days actual suspension.

Finally, the evidence discloses that Franklin, serving as track foreman, was faced with no restrictions in terminating black employees under his supervision, but relative to white employees under his supervision, Franklin was required to present written complaints to his Roadmaster before terminating white employees.

James Edward Williams who was employed as a laborer in the "ramp" area in 1973 was terminated eight months later on the ground that he had missed a call. Williams testified that upon being advised of the call, he called in and talked with the acting foreman and later presented a doctor's statement explaining the reason for his absence, but was terminated anyway; and that an investigation of the matter was never instituted. Williams testified further that his immediate foreman, Clark Hill, always addressed him as "boy" in referring to him and that he registered his disapproval of the use of the term "boy."

Diane Jones, a black female, testified that she was first employed at Missouri Pacific in March, 1977, by Jack Sheridan as a laborer in the maintenance shop; and that during the initial interview, she informed Sheridan that she had been placed on probation for the offense of attempted forgery which was to be expunged from her record during the month of August of 1977. Jones testified that Sheridan advised her, at that time, that even

20. Franklin testified that he was authorized to enter the main track by a white dispatcher on duty at the time. See page 538 of the transcript.

though she had not designated this information on her application, this "was no problem." Approximately one month later, Jones was terminated by Sheridan although she had not received any complaints about her work performance and she was not given any reason or explanation for the termination.

Billy Collins testified that he was hired on December 11, 1973, as a switchman. However, on occasions he was used as a brakeman. While serving as a switchman, Collins' activities were confined to the yard or the local area; but as brakeman, Collins would serve "on runs to Poplar Bluff, Missouri, and Memphis." Collins was terminated on August 28, 1974, for missing five or six calls, over a ten month period, requesting him to report for work following eight hours rest period after the completion of an assignment. Collins testified that he was unaware of any white employee who was terminated for missing calls; Collins stated that "I know they've been laid off or suspended or given some kind of probationary period or something like that," but not fired. Collins stated that he knew of other black employees who had been fired for missing phone calls, but could only name one, J.L. Jett.

Collins attributes the severe action of termination to race by relating an incident involving his immediate supervisor, Superintendent P.L. Tucker, when Collins requested that he be made a permanent brakeman since the greater part of his work assignments involved the duties of a brakeman. Collins stated Superintendent Tucker responded as follows: "He told me he would fire my ass, if I wanted to be anything else" other than a switchman. Collins stated that he had never heard Superintendent Tucker talk to white employees in that manner.[21]

After carefully considering plaintiffs' anecdotal evidence, the evidence offered in connection with plaintiffs' terms and condition claims as well as the latitude that subjectivity is employed in assessing discipline and termination, this Court is of the view that plaintiffs have met their burden of establishing a *prima facie* case, by a preponderance of the

evidence, of a pattern and practice of discrimination against members of the relevant class based on race. Further, the Court is persuaded that Missouri Pacific has failed to demonstrate legitimate or nondiscriminatory reasons for disparate treatment in disciplining black employees in the Maintenance-of-Way Department. In other words, Missouri Pacific has not rebutted plaintiffs' *prima facie* case.

## V

### Individual Claims

The remaining claims to be resolved concern the alleged disparate treatment experienced by the following individuals at the behest of Missouri Pacific: Robert Webb, Earnest Franklin, John Sykes, Jerry Deloney, Curtis Carter, Sidney Williams, Lawrence Barbee and Barry Stewart.

In a proceeding involving an individual claim of disparate treatment premised on race, plaintiff has the responsibility to establish a *prima facie* case of intentional discrimination by a preponderance of the evidence. If the plaintiff is successful, the burden shifts to the employer to produce evidence that the employment decisions under scrutiny were for legitimate and non-discriminatory reasons. If the employer "carr[ies] this burden", plaintiff has the duty to establish, by a preponderance of the evidence, that the alleged reasons are pretextual to cover racial discrimination. Plaintiff possesses the ultimate burden, at all times, of persuading the Court that he has been a victim of purposeful discrimination. See: *St. Mary's Honor Center v. Hicks,* —— U.S. ——, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

### Robert Webb

Robert Webb testified that between 1971 and 1980 he had made numerous applications for employment with Missouri Pacific

---

**21.** As a switchman, Collins' claim for relief was part of the Transportation Subclass discipline claims which the Court dismissed pursuant to order dated June 2, 1988. Plaintiffs are offering this testimony for background purposes only.

at its Pike Avenue office in North Little Rock, Arkansas. Webb further testified that he was not seeking any particular type of job, but was simply interested in working for the railroad. He stated also that on an occasion he was interviewed by a Mr. Trimble and was told that there were no openings and that he should check back later. Webb stated that after a "two-week period, I called him back again, so he said you know—he still didn't have anything, so check back in about six weeks. So I kept—I kept waiting, I kept waiting, so I called him again. And after calling that time, I didn't get any response from him. And I just—I stopped for a little while and just started thinking."

On another occasion in 1980, Webb said he requested an application in order to apply again for employment, but was advised that Missouri Pacific was not "taking applications," but saw the company's "applicant flow charts" and observed that both blacks and whites had been hired; and that he concluded from this observation that more whites had been hired than blacks.

On cross examination, Webb said that in observing the applicant flow charts he simply concluded that more whites had applied for work than blacks. Webb also stated that he actually filled out applications for employment "somewhere in between '72 and '73.

The Court finds that Mr. Webb has failed to establish a *prima facie* case, by a preponderance of the evidence, demonstrating that Missouri Pacific intentionally discriminated against him because of race in Webb's efforts to gain employment. It is plain that Webb's claim of discrimination is premised on conjecture and speculation. Accordingly, Webb's complaint is dismissed with prejudice.

### Earnest Franklin

In addressing the class claims regarding discrimination in the discharge and discipline of black employees, the Court dealt extensively with the personal experiences of Earnest Franklin, as a class member. The Court concluded that plaintiffs had met their burden of establishing a *prima facie* case of a pattern and practice of discrimination against members of the class based on race; and that Missouri Pacific had failed to demonstrate nondiscriminatory reasons for the

disparity in treatment accorded black employees who were terminated or disciplined. The Court finds that Franklin has established disparate treatment in the numerous disciplines imposed by Missouri Pacific during his tenure as reflected in his testimony discussed earlier. In addition, Missouri Pacific has failed to demonstrate that its action was based on legitimate and nondiscriminatory reasons.

### John Sykes

John Sykes, an intervenor in the Maintenance–of–Way subclass, was employed by Missouri Pacific on October 19, 1981, as a trackman subject, however, to the sixty day probationary period that applied to all new employees. The thrust of Mr. Sykes claim is essentially that Missouri Pacific terminated him within the sixty day probationary period, but without reason; and that, in his judgment, his work performance was satisfactory.

In addition to creating hazards to himself and fellow employees, in the use of equipment, Sykes reported for work late on several occasions and worked less than the expected eight hours per work day. For example, Sykes was approximately thirty minutes late for work on the first day of his employment. David Craft, Sykes' track foreman, testified that Sykes seemed to be disoriented while performing his assigned duties. Craft testified that he recommended that Sykes not be retained as an employee because he was an unsafe worker. Craft further testified that he also recommended that a white employee, Barton, not be retained because he was physically unable to perform trackman duties. The Court finds that Sykes has failed to establish a *prima facie* case that his termination during the probationary period was based upon race. Accordingly, Sykes' complaint is dismissed with prejudice.

### Jerry Deloney

Jerry Deloney, an intervenor who possesses two and one half years of college at the University of Arkansas at Little Rock in the field of electrical engineering, was hired as a trackman by Missouri Pacific on February 22, 1980. Deloney initially worked at Hope, Arkansas for approximately three

months and was transferred to the panel plant in North Little Rock. After approximately four disciplinary proceedings—deferred suspension for failure to file timely and accurate injury report, suspension for quarrelsome and vicious behavior toward foreman, dismissal for second instance of being quarrelsome and vicious toward foreman and dismissal for excessive absenteeism—Deloney was terminated on December 31, 1981.

Deloney contends that the disciplinary proceedings instituted against him, and his failure to receive a promotion to assistant foreman as well as being afforded the opportunity to transfer to the Car Department to the end that he might exercise his skills and expertise in the electrical field are due to intentional racial discrimination. After carefully reviewing the evidence proffered by both Deloney and Missouri Pacific regarding the aforementioned disciplinary action only, the Court is persuaded that Deloney has failed to establish a *prima facie* case by a preponderance of the evidence that the employment decisions complained of were premised on race. However, assuming that Deloney has established a *prima facie* case, Missouri Pacific has demonstrated, relative to the aforementioned issues just identified only, that the employment decisions under scrutiny were based on legitimate and non-discriminatory reasons; and that Deloney has failed to show that such asserted reasons are pretextual.

### 1. Failure to File Timely and Accurate Injury Report

Deloney claimed that he sustained an injury to his right hand while spike mauling on March 18, 1981, around three o'clock in the afternoon. Due to alleged discrepancies in the report filed by Deloney, a formal investigation was conducted on April 9, 1981. During the hearing, trackman E. Bradley and track foreman R. Norment, among others in the work area at time of the purported injury, offered evidence to the effect that Deloney did not manifest any injury until the day following the alleged date of the injury when Deloney appeared in the work area with a bandage on his hand; that Deloney was not observed mauling on the date that the alleged injury occurred; and Deloney admitted not reporting the injury to any supervisor until the day after the date of the purported injury. Richard W. Freeman, the trainmaster who conducted the investigation, recommended to Superintendent Ralph Ramsey that Deloney be dismissed for falsification of a personal injury report which recommendation was accepted.

Deloney appealed the dismissal by invoking the grievance procedure of Missouri Pacific and, as a consequence, the dismissal was reduced to thirty days deferred suspension and Deloney received full back pay for the thirty days he was off. Deloney was unable to identify any white employees who were not disciplined for a similar offense. In addition, Missouri Pacific offered evidence to the effect that two white employees, Paula Sardin and Linda Caldwell, received greater discipline for failure to make timely and accurate personal injury reports. Sardin was dismissed for six months and Caldwell was terminated.

### 2. Quarrelsome and Vicious Behavior Toward Foreman

H.H. Drake, a track foreman for a group of trackmen who worked in close proximity to the group that Deloney was part of, allegedly observed Deloney, on July 13, 1981, smoking and not setting spikes, which was Deloney's assignment at the time. Drake admonished Deloney to go to work. A dispute developed which centered around Drake's authority to direct Deloney's work activities since Drake was not Deloney's foreman. Deloney initially denied, but later admitted that during the dispute he told Drake that he was a "Goddamn lying son of a bitch." An investigation was conducted by trainmaster David Dealy who discounted the testimony of witnesses called by Deloney who stated that they did not hear Deloney make the statement on the ground that these witnesses were not in hearing distance or were evasive in their testimony. In accepting Drake's version of the controversy, Dealy recommended a thirty day actual suspension which was followed by Superintendent Ramsey.

Missouri Pacific submitted evidence demonstrating that two white employees, William E. Ross and G.R. Peters, were dismissed and kept out of service for two years and three months, respectively, for similar conduct.

### 3. Second Incident of Being Quarrelsome Toward Foreman

On August 10, 1981, Deloney returned to work following the completion of the thirty day suspension for cursing foreman Drake as previously discussed. While engaged in work activity in the panel area, track foreman Jim Pruitt approached Deloney and directed Deloney to work on a switch. Deloney's response to Pruitt was "Fuck you, are you crazy?"

Trainmaster G.T. Stewart conducted the investigation regarding the incident and, after receiving testimony from witnesses who confirmed that Deloney made the statement to the foreman, Stewart recommended that Deloney be dismissed for violating the quarrelsome and vicious rule. On August 14, 1981, Deloney was dismissed by Superintendent Ramsey. However, Superintendent Ramsey reinstated Deloney on November 9, 1981, after Deloney agreed to the reinstatement and further agreed to drop his appeal of the dismissal sanction.

### 4. Excessive Absenteeism

On December 14, 1981, Trainmaster G.T. Stewart presided over an investigation involving a charge against Deloney for excessive absenteeism from his job. During the hearing, evidence was offered that disclosed that Deloney was absent from work, without permission, on November 9, 10, 12, 13, 17, 18, 20 and 23, 1981. Panel plant supervisor Clyde Brown testified that he had counselled Deloney about his attendance and that Deloney advised him that he, Deloney, did not want to work for the railroad and was looking for other work. Superintendent Ramsey, in accordance with the recommendation of trainmaster Stewart, terminated Deloney. Deloney did not offer any evidence to the effect that there were white employees who were treated differently when confronted with a charge of excessive absenteeism. As a matter of fact, Missouri Pacific offered proof that a white employee, T.A. Holdford, was permanently dismissed for excessive absenteeism.

### 5. Promotion

Deloney has alleged that he applied for assistant track foreman position, but never received a favorable response other than "your name is in hat." Deloney further testified that a white employee, Jim Pruitt, who was employed by Missouri Pacific on the same date he was hired was elevated to an assistant foreman position within nine months after being hired.

Missouri Pacific offered testimony that disclosed that Deloney, although having indicated an interest in becoming an assistant foreman, never submitted a bid for the position and did not take the rules examination which are prerequisites for promotion to assistant foreman. In addition, the evidence reflects that Jim Pruitt had a higher seniority rating than Deloney. The evidence further reflects that the panel supervisor, Clyde O. Brown, was responsible for the promotion of several blacks to assistant foreman and foreman slots.

### 6. Transfer

While the Court has dismissed the Maintenance-of-Way Subclass transfer claims, Deloney raises an individual claim of discrimination in his efforts to transfer. In support of this claim, Deloney alleges that he advised Superintendent Dent in March, 1981, of his interest in seeking a transfer to either the Mechanical Department or the Car Department to the end that he might exercise his electrical skills. The evidence fails to demonstrate that there were vacancies in the departments that Deloney was interested in transferring to. Moreover, Deloney's own witness, Annette Johnson, testified that individuals were not eligible to fill the electrician position sought by Deloney unless they were qualified journeymen electricians. The evidence is deficient in demonstrating that Deloney was a qualified "journeyman electrician."

Terms And Conditions Of Employment

■ Deloney finally contends that during his eighteen months tenure with Missouri Pacific he was required to work in an environment that was racially intimidating and insulting. The Court has already found that plaintiffs have established a *prima facie* case of racial harassment, slurs and disrespect that black employees were subjected to in the work environment, in connection with the class claims relating to Maintenance–of–Way and Transportation Subclasses; and that Missouri Pacific has failed to rebut plaintiffs' *prima facie* case.

Deloney has testified to the following in seeking to establish a *prima facie* case:

1. Panel Plant Supervisor Clyde O. Brown, during shift meetings with black and white employees "every morning," would say "we are going to call a spade a spade" and "all the whites would start smiling and giggling" and they would be looking "dead at us and laughing."

2. While performing a job assignment, on an occasion, near a loudspeaker, which was one among many located throughout the work area and constituting Missouri Pacific's public-address system, Deloney heard a male voice state "If he does it again, fire that nigger."

3. After Deloney had completed the second dismissal for the second offense of being quarrelsome and abusive to the track foreman, Jim Pruitt, Pruitt came to Deloney and apologized for the incident and acknowledged that he, Pruitt, was responsible for the whole incident stating that he, Pruitt, had been told that Deloney "didn't like white people" and Pruitt invited Deloney to "take a swing at him [Pruitt], if I [Deloney] wanted to if that would patch it up between us. He wanted us to be friends again." (T 248–250). Deloney declined the invitation.

Based on Deloney's testimony coupled with the findings made by the Court relative to the Maintenance–of–Way Subclass claims regarding the terms and conditions of the work environment, the Court is persuaded that Deloney has established a *prima facie* case by a preponderance of the evidence. Missouri Pacific argues that this issue is moot under Title VII since there is no showing of any current need for any injunctive relief. The Court rejected this same argument asserted in the class action claims at footnote 15 and the Court rejects the argument here for the same reason.

■ Finally, the Court will observe that, perhaps, the abnormal environment in which Deloney was required to perform his work assignments may have sparked or set off the irrational and injudicious behavior on the part of Deloney leading to the numerous charges placed against him resulting not only in the dismissal and suspension of Deloney, but the loss of valuable time and money on the part of Missouri Pacific as well as a diminished good working relationship between the black and white employees constituting Missouri Pacific workforce. The Court, however, is not persuaded that the evidence here is sufficient to warrant a finding of constructive discharge of Deloney. It is clear that at the end of each dismissal imposed, except the excessive absenteeism dismissal, Deloney was permitted to return to work. Indeed, two wrongs never make a right. In other words, Deloney is not justified in being abusive and quarrelsome with his supervisor even though conditions under which he was required to work motivated both external as well as internal frustration resulting in the loss of self control and stability. This is but a part of the concept and adage that one may not take the law into his own hands. Indeed, this is the purpose for which grievance procedures are designed and structured so that complaints may be resolved objectively, fairly and humanely.

### Curtis Carter

Curtis Carter, an intervenor who is black, is a member of the Maintenance–of–Way Subclass. Carter was employed by Missouri Pacific, as a trackman, from 1979 to April 1982 when he was furloughed and later advised that he could not return to work because he failed, allegedly, to return to work as requested. Carter asserts several claims involving employment decisions that affected him adversely and that these decisions, purportedly, were racially motivated.

### 1. Work Environment And Terms And Conditions Of Employment

■ Carter testified that his immediate supervisors, track foreman Frank Chaney, Roadmaster Clyde Brown and Roadmaster Chapman, employed racial slurs or epithets—"black bastards," "niggers," and "son of a bitch" in communicating with him and other black trackmen during working hours.

Carter also testified that he and other black trackmen on many occasions were required to work in rough weather—"rain, snow, sleet and like that"—while white employees were permitted to sit in "the storeroom."

Missouri Pacific, in its case in chief, called the supervisors identified by Carter as the individuals who harassed him. The supervisors denied using racial slurs in communicating with black employees and further denied requiring blacks to work in unfavorable weather conditions while permitting whites to secure shelter. In crediting the testimony of Carter as well as noting the testimony of the class members regarding terms and conditions of employment, the Court finds that Carter has established a *prima facie* case, by a preponderance of the evidence, relative to being subject to racial slurs, but not as to the claim that black trackmen were compelled to work in inclement weather while their white counterparts were afforded protection coverage in "the storeroom"; and that Missouri Pacific has failed to rebut Carter's *prima facie case* or offer any legitimate and nondiscriminatory reasons for the conduct complained of. Carter's claim of being required to work in unfavorable weather conditions is dismissed with prejudice.

### 2. Transfers

■ Carter asserts that at the time he applied for work he advised Missouri Pacific's representative that he was interested in a "braker" *job;* and that he was advised by a Mr. Adams, who interviewed him, that no brakemen positions were available, but Carter would be automatically transferred when an opening occurred.

In addition, Carter contends that sometime during August, 1979, he spoke to Roadmaster Chapman about a transfer and was advised by Chapman to write letters to the department heads in the areas that he was interested in transferring to in order to obtain a transfer. On or about August 27, 1979, Carter made an oral request to transfer to engine service. On August 30, 1979, a white employee, Tommy Eubanks who was in Maintenance–of–Way Department and possessed less seniority than Carter, was permitted to transfer to the Transportation Department to fill one of two vacancies. Carter contends that his request for a transfer was denied because of race.

After carefully considering the evidence offered by both Carter and Missouri Pacific, the Court finds that Carter has failed to establish a *prima facie* case, by a preponderance of the evidence and, assuming that he has established a *prima facie* case, by a preponderance of the evidence, Missouri Pacific has demonstrated that legitimate and nondiscriminatory reasons were relied on in not granting Carter's requests for transfers and that Carter has failed to show that the asserted reasons are pretextual.

First, Adams, the person who interviewed Carter when Carter first applied for employment, denied that he advised Carter that Carter would be automatically transferred to a brakeman's position when an opening developed. Moreover, the evidence reflects that Adams, at the time, was an Employment Assistant, a clerk, and not a personnel manager as alleged and did not have the authority to make or initiate transfers.

Relative to the transfer given to Eubanks, the evidence shows that Eubanks submitted a written application requesting a transfer, which was consistent with the policy of Missouri Pacific, while Carter simply made an oral request to transfer. Moreover, the evidence further reflects that Carter was unaware of Eubanks' qualifications, nor was he in a position to identify any person, white or black, who had been permitted to transfer to the Transportation Department pursuant to an oral request. In addition, Carter could not identify the race of the individual who filled the second opening in the Transportation Department at the time Eubank's request was granted. Missouri Pacific, howev-

er, offered evidence disclosing, among other things, that two blacks, L.C. Parks and Danny McDaniel, transferred pursuant to written requests during the same time frame in question.

### 3. Promotion to Maintenance–of–Way Foreman

██ The Court finds that Carter has failed to establish a *prima facie* case, by a preponderance of the evidence, that Missouri Pacific purposely denied Carter the opportunity to either attend foreman school, acquire a copy of the book of rules in order to become knowledgeable of the duties of foreman, or become an assistant foreman or a foreman because of race.

The evidence reflects that Carter's supervisors, Chapman and Brown, were not only concerned about Carter's work performance, but equally his attendance record. Chapman testified that he would not have recommended Carter for a foreman's position due to his poor work record.

### 4. Dismissal

██ Missouri Pacific cancelled Carter's seniority rights as an employee because of Carter's failure to report for work at the North Little Rock Panel Plant on April 1, 1982, as directed, resulting in the termination of Carter as an employee. Carter contends that the termination of his seniority rights was premised on his race. The Court finds that the action of Missouri Pacific culminating in the dismissal of Carter was not based on race and that Carter's claim is dismissed with prejudice.

The evidence reflects that in late March of 1982, Carter received a "cut-off letter"—due to the reduction of the work force, an individual with more seniority would be designated to fill the position then occupied by Carter. A few days later, Carter received a notice to report for work and check with supervisor C.D. Brown at the Panel Plant on April 1, 1982. Carter ignored the order and took the position that he was not required to honor the order inasmuch as the terms and conditions under the collective bargaining agreement, as well as Rule 2(j) which is part of the collective bargaining agreement, afforded him twenty days from the date of receipt of the "cut-off letter" to invoke his seniority rights to replace an employee, within the district, with less seniority.[22] The Court finds that even though Carter possessed twenty days in which to invoke his seniority rights, he was also required to report for work if recalled during the twenty day time frame. The Court also finds that not only Carter, but other employees who were not working at the time were recalled in the order of seniority. Carter admitted that he could not identify any white employees who violated Rule 2(j) and were permitted to retain their seniority. This Court is persuaded that race was not a factor in the termination of Carter's seniority rights.

### Sidney Williams

██ Sidney Williams was employed by Missouri Pacific as a laborer during 1978. On May 15, 1979, Williams requested a transfer to the Transportation Department, but his request was not granted until August 9, 1979. However, between May 15 and 21, 1979, seven individuals transferred to the Transportation Department. In addition, twelve employees were permitted to transfer to the department after William's request was made, but before his request was granted. On the date that Williams received his transfer, approximately five other individuals were permitted also to transfer.

Williams contends that the eleven week delay in having his request fulfilled is due to his race. In support of this conclusion, Williams contends that several whites who received transfers before his request was

---

**22.** Rule 2(j) provides in material part:

A furloughed employee is one who is unable to hold a regular assignment in any classification. Employees who are furloughed will be called back to service in the order of their seniority. To be eligible for recall to service under this rule the furloughed employee must file his name and address in writing with the appropriate division officer with copy to the local chairman within ten (10) days after being furloughed, and failing to file name and address [one will] forfeit his seniority. Failure to return to service within seven (7) calendar days after recall for a regular assignment ... [one will] forfeit seniority in the class for which called....

granted possessed less seniority and others were permitted to transfer from other departments.

Missouri Pacific has proffered evidence demonstrating that of the several employees permitted to transfer between Williams' request and his actual transfer, five were black; that the following employees transferred after Williams made his request, but these employees' requests for transfer preceded Williams' request: J.M. Harper, M. Abraham, D.F. Eheman, W.J. Bryant, J.M. Crow, C.P. King and N.A. Davis; and that five employees were transferred on the same date as Williams, but possessed more seniority. The Court finds that in filling engine service vacancies, qualified engineers who transferred from other railroads were afforded a preference pursuant to a policy of Missouri Pacific not predicated on race. The Court is, therefore, of the view that Missouri Pacific has shown that the transfers complained of were based on legitimate and non-discriminatory reasons. Accordingly, Williams' complaint is dismissed with prejudice.

Sidney Williams also asserts a claim against Missouri Pacific for having been required to work in an environment that was racially hostile. In support of this claim, Williams related an incident involving a fellow white employee, Donnie Chambliss, a fireman, who approached Williams and asked "what a black boy was doing working the first shift." The incident allegedly occurred during January, 1982.

Steve Sparr, the mechanical department foreman, entered the area during the exchange between Williams and Chambliss. Sparr, upon being advised of Chambliss comment, requested Chambliss to step outside. Upon returning to the area where Williams was standing, Sparr stated to Williams "you know how these Arkansas rednecks are" and returned to his office. This was the only alleged racial incident that Williams could recall during his six years tenure in the mechanical department. The Court finds

that Williams' single claim of hostile working environment is insufficient to establish a prima facie case and Williams' claim is dismissed with prejudice.

## Lawrence Barbee

Lawrence Barbee, an intervenor in the Transportation Subclass, graduated from the University of Arkansas at Pine Bluff with a B.S. degree in Business Administration in June of 1973. Barbee applied for employment with Missouri Pacific on June 17, 1973. Barbee advised a Mr. A.J. Daniel who interviewed him that he was interested in a Management Program. Barbee was advised that the only opening, at the time, was a clerk's position which would be available in two weeks, but Barbee could commence work immediately as a laborer in the Mechanical Department and fill the clerk's position within two weeks. Barbee accepted the offer. Approximately two weeks later, Barbee was placed under the supervision of an engine dispatcher or crew caller for a period of two weeks, in order to acquire on the job experience before assuming the title of crew caller or dispatcher. Barbee served as dispatcher for a period of one year when he was assigned the position of file clerk or custodian of records as well as being in charge of communication received and sent out.[23]

On May 22, 1976, Barbee transferred into engine service as fireman of the Arkansas Division with a seniority date of May 22, 1976, and two years later Barbee became an engineer.

 Barbee's alleged disparate treatment claims are focused around several instances when he was disciplined while working as a fireman or engineer and the work environment.

The following instances constitute the disciplines complained of, but the Court finds that Barbee has failed to establish a prima facie case by a preponderance of the evidence of purposeful discrimination based on race and the disciplinary claims are dismissed with prejudice:

---

23. Barbee testified extensively about the futile efforts to enroll in Missouri Pacific's management program while observing numerous white employees with less seniority entering the training program. The Court finds, however, that Barbee is not seeking relief for the alleged difficulties that he encountered, but such testimony is being offered for background purposes only.

Barbee, serving as engineer, was dismissed, along with a couple of other crew members, on April 16, 1980, following a formal investigation, for moving his train, consisting of 83 cars, through an interlocking limits at Bridge Junction without proper authority (passing a red signal). Bridge Junction is an intersection with a competing rail entity, Frisco Railroad. The incident was regarded by Missouri Pacific as a serious rules violation. Barbee was reinstated on September 22, 1980, approximately five months following his dismissal.

First, Barbee alleges that his dismissal was motivated by his race for essentially two reasons. Barbee contends that a white engineer by the name of Rainey drove a train under his control through the Bridge Junction interlocker without authority, but was not disciplined. Significantly, Barbee concedes that he has no evidence that management was ever made aware of Rainey's alleged violation of the rules, or that the control operator at the intersection who reported Barbee's violation to management was knowledgeable of Rainey's conduct. It is plain that an employer cannot be held accountable for failing to discipline an employee when the employer is unaware of the employee's alleged improper actions.

Barbee also argues that Missouri Pacific applied or implemented the applicable rules, governing the operation of a train through an interlock, in an uneven handed manner in investigating the Bridge Junction incident. In essence, Barbee contends that the investigator, a Mr. Kelly, wrongfully interpreted the rules. The Court will simply note that Barbee has failed to demonstrate in any way that investigator Kelly's conclusion that Barbee had created a dangerous situation in operating his train in disregard of a red signal was unreasonable or reached in bad faith. In addition, Mr. Kelly testified that he did not know Mr. Barbee was black when he dismissed him and became aware of Mr. Barbee's color when he received a copy of the complaint alleging discrimination.

On October 25, 1980, Mr. Barbee was operating a train over the Red River Bridge near Fulton, Arkansas, when the train went into emergency and one car derailed. A formal investigation was conducted on November 13, 1980. Missouri Pacific found that Barbee had committed a rules violation and in considering his prior safety record, Missouri Pacific dismissed him. However, Mr. Barbee was reinstated during June, 1981, but was restricted to yard service for a period of two years. Barbee contends that the restriction of his engineering skills to yard service for two years was because of his race.

Missouri Pacific offered testimony to the effect that yard service restriction was imposed in order to enable Mr. Barbee to cope with his train handling problems by operating smaller trains at lower speeds and under closer supervision. Missouri Pacific also established that the following white employees with records similar to Mr. Barbee's were restricted to yard service: H.L. Steen, a brakeman/conductor; D.L. Dosier, an engineer; and an engineer named Voyne.

### Work Environment

Relative to the adverse work environment that he was required to perform his work assignments with the knowledge of management, Barbee testified as follows:

Q. Have you ever had occasion to see written letters or racial connotations or slurs on any property of Missouri Pacific?

. . . . .

A. Well, I have observed racial slurs first of all in the bathrooms at the service track facility, the bathrooms in the depot at Popular Bluff, the bathrooms in the Texarkana depot. Also, I have observed slurs from time to time actually on the engine inside the cab and I have observed different signs on box cars.

Q. When is the last sign that you observed, as recent as when?

A. As recently as two weeks ago.

Q. And what was the sign on that box car?

A. K.K.K.

. . . . .

A. It's located on North Little Rock panel yard.

. . . . .

A. I had been observing that sign for approximately six months.

Q. Is that box car physically located in plain view for managerial personnel or Mo–Pac to observe?

A. Yes, it's in plain view.

Q. And you observed that as recent as two weeks ago?

A. That is correct.

The Court is persuaded that Barbee has established a *prima facie* case, by a preponderance of the evidence, that he was required to work in an environment that was racially intimidating and that Missouri Pacific, although aware of the on going racial harassment, failed to take immediate and constructive steps to remedy the problem.

### Barry Duran Stewart

 Barry Duran Stewart, a black male, who received a high school G.E.D. and completed one year of college at the University of Arkansas at Little Rock, Arkansas, was hired by Missouri Pacific in 1977, in the job category of switchman, brakeman and fireman.

In 1978, Stewart was dismissed, but was recalled in 1979. Approximately three months after being recalled, Stewart was terminated for being late for work and manifesting "[a] lack of interest in the service." Stewart conceded, on cross examination, that he had been warned on several occasions about reporting for work late. Stewart contends that he was terminated because of race. Stewart asserts that there were white employees who reported for work late, but were not terminated. Stewart was unable to identify these alleged white employees.

Stewart also contends that he was subjected to racial slurs during his tenure as an employee. As an example, Stewart related an incident involving trainmaster Joe Bikaccki when the trainmaster, in disciplining him verbally, stated "nigger you better not show up on my job late again."

Stewart testified that a foreman whom he could not identify was more friendly with white employees than with Stewart. Stewart did not identify the white employees allegedly involved. Stewart stated that on several occasions he had completed his assigned tasks early and, therefore, was eligible to go home early, but was not permitted to do so by his foreman. Again, Stewart was unable to identify either the foreman or the white employees treated differently. Moreover, Stewart also testified that there were black employees who were permitted to go home early upon the completion of assigned tasks before the scheduled quitting time. The Court finds that Stewart has failed to establish a *prima facie* case of purposeful racial discrimination in employment decisions affecting him personally, by a preponderance of the evidence. However, the Court is persuaded that Stewart was subjected, during his tenure, to racial slurs and a work environment that was hostile.

Accordingly, Stewart's complaint, with the exception of the work environment claim, is dismissed with prejudice.

### Conclusion

Inasmuch as this action has been pending for a substantial number of years and the record is enormous, i.e., the transcript of the oral testimony received in this action is in excess of 22,000 pages and Missouri Pacific's exhibits alone are in excess of 2,300, counsel for the respective parties are admonished to advise the Court within ten (10) days from the receipt of this memorandum opinion and order whether the Court has addressed all issues tendered for resolution. Failure to respond within the time frame indicated will be considered as an acknowledgment that all issues have been addressed.

Further, counsel and the parties are directed to meet in settlement conference within thirty (30) days from the date of receipt of this memorandum opinion and order in an effort to resolve the remedy question. A joint pleading shall be filed within twenty (20) days after the settlement conference advising the Court of the date, or dates, place, time consumed as well as the identity of the participants in the discussions.

IT IS SO ORDERED.